THE SUPERIOR COURT FOR THE STATE OF ALASKA
FIRST JUDICIAL DISTRICT AT JUNEAU

ALASKA RETIREMENT )
MANAGEMENT BOARD on behalf )
of STATE OF ALASKA PUBLIC )
EMPLOYEES' RETIREMENT SYSTEM )
and STATE OF ALASKA TEACHERS' )
RETIREMENT SYSTEM, )
 )
                Plaintiff, )
 )
  v. )
 )
MERCER (US), INC., MERCER HUMAN )
RESOURCE CONSULTING, INC., AND )
WILLIAM M. MERCER, INC. )
 )
               Defendants. )    Case No. 1JU-07-_____ CI
_____)

## COMPLAINT

Plaintiff Alaska Retirement Management Board ("the ARM Board") alleges for its Complaint, on information and belief as to allegations concerning other parties:

### Nature of the Action

1. This action seeks redress for actuarial malpractice, breach of professional duty and breach of contract that have caused at least $1.8 billion in damages to the State of Alaska Public Employees' Retirement System ("PERS") and the State of Alaska Teachers' Retirement System ("TRS"), two retirement and benefit plans administered by the ARM Board.

**EXHIBIT A**
**Page 1 of 27**

COMPLAINT                                                                       Page 1 of 27
AK Retirement Mgmt Board et al. v. Mercer (US) Inc., et al.: 1JU-07-_____ CI

2. Beginning in the 1970s and until 2006, Defendants Mercer (US), Inc. and its predecessors, defendants Mercer Human Resource Consulting, Inc., and William M. Mercer, Inc. (collectively, "Mercer"), served as the actuarial firm for PERS and TRS (collectively the "Plans"), Alaska's two largest public pension and benefit plans. More than 80,000 Alaskans and former Alaskans who work for or who have worked for over 200 participating public employers throughout the State look to or will look to PERS and TRS for pension and post-retirement health benefits.

3. Holding itself out as "the global leader in retirement services," whose professionals use "state-of-the art tools," Mercer claims "offices in more countries than any other HR consulting firm and over 4,800 retirement consultants and actuaries worldwide." As the Plans' actuarial firm, Mercer had the responsibility to perform critical functions for PERS and TRS, including the calculation of expected Plan liabilities and the determination of employer contribution rates necessary to fund benefits the Plans promised to workers and their families. Mercer understood that accurate determinations of liabilities and contribution rates were essential to meet fundamental objectives of the Plans.

4. Those objectives – which Mercer explicitly and repeatedly acknowledged – included (a) *full funding* of the Plans – the accumulation of assets sufficient (with expected earnings) to pay benefit obligations when they became due; (b) the collection of contributions sufficient to fund each employee's future benefits *during that employee's working lifetime*; (c) the maintenance of *relatively stable contribution rates* over time, to prevent sudden changes that frustrate the orderly

COMPLAINT
*AK Retirement Mgmt Board et al. v. Mercer (US) Inc., et al.*; 1JU-07-_____ CI

Case 1:08-cv-00002-HRH   Document 1-2   Filed 01/07/08   Page 2 of 13

financial plans of contributing employers responsible for essential governmental functions; and (d) advance funding of *health care costs* as well as other benefit obligations. The Administrator of PERS and TRS, acting on behalf of the trustees of the Plans, retained Mercer to ensure that the Plans did not make empty, unfunded promises, disrupt the financial planning of participating employers or burden future generations with significant pension and health care costs.

5. Mercer's negligence and breaches of duty frustrated the Plans' ability to achieve these funding objectives and injured the Plans. Fully aware of the billions of dollars at stake, Mercer nevertheless made fundamental errors in methodology and even in basic calculations, and failed to assign competent, experienced personnel to work for the Plans. Because of this misconduct, Mercer miscalculated -- by over $1.8 billion -- the contributions necessary to fund the Plans.

6. The opportunity to collect those funds as planned has now vanished. Participating employers have understandably committed the funds elsewhere -- for police officers, schoolbooks, parks, hospitals or other important functions -- and their financial planning has been disrupted by huge increases in contribution rates caused by Mercer's misconduct. Just what the Plans wished to avoid – just what they hired Mercer to prevent -- has occurred.

7. Mercer's failure to meet its obligations to the Plans is one of the most significant factors contributing to the financial crisis in Alaska's pension and health system. Through this action, the ARM Board seeks to recover the more than

COMPLAINT
*AK Retirement Mgmt Board et al. v. Mercer (US) Inc., et al* ; 1JU-07-_____CI

Page 3 of 27
**EXHIBIT A**
**Page 3 of 27**

Case 1:08-cv-00002-HRH   Document 1-2   Filed 01/07/08   Page 3 of 13

$1.8 billion lost because of Mercer's conduct, and so help to restore the financial stability of the Plans.

## The Parties

8. Since October 1, 2005, the ARM Board has been the trustee of the assets of PERS and TRS.

9. PERS is a retirement plan for employees of approximately 160 separate participating employers, including the State of Alaska as an employer, and political subdivisions of the State, including municipalities, local government bodies, housing authorities, and other public organizations throughout Alaska. It provides defined pension, disability, survivor and health care benefits to plan members hired prior to July 1, 2006, and their beneficiaries. Nearly 61,000 individuals and their families now depend on PERS for benefits or will be eligible for benefits upon retirement. PERS held approximately $9.38 billion in assets as of June 30, 2006.

10. TRS is a retirement plan for educators in Alaska working at 58 separate public educational employers throughout the State. Like PERS, TRS provides defined pension, disability, survivor and health care benefits to plan members who were hired prior to July 1, 2006, and their beneficiaries. Nearly 20,000 individuals and their families now depend on TRS for benefits or will be eligible for benefits upon retirement. TRS held approximately $4.3 billion in assets as of June 30, 2006.

11. Until the ARM Board was established on October 1, 2005, PERS was overseen by the Public Employees' Retirement Board ("PERB") and TRS by the Teachers Retirement Board ("TRB") (collectively, "the Boards"). From July 1, 1993,

Case 1:08-cv-00002-HRH   Document 1-2   Filed 01/07/08   Page 4 of 13

until the establishment of the ARM Board, the Alaska State Pension Investment Board ("ASPIB") acted as trustee of the assets of PERS and TRS and managed the investment of those assets. Prior to July 1, 1993, the Commissioner of the Alaska Department of Revenue acted as trustee of the assets of PERS and TRS and managed the investment of those assets.

12. The Division of Retirement Benefits ("DRB") of the Alaska Department of Administration administers PERS and TRS.

13. Mercer (US), Inc. (formerly known as Mercer Human Resources Consulting, Inc., and as William M. Mercer, Inc.) is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware, 19801. Mercer presents itself as one of the most competent, sophisticated and experienced advisors to pension and benefit plans. It claims that "Clients choose Mercer when they want to work in partnership with their consultant, want strategic advice as well as flawless administration and execution of their HR programs, want best-practice advice and solutions tailored to their business and environment, or need global and/or local perspectives and resources."

14. Mercer also represents that it has particular expertise in health care: "Mercer combines health and benefits expertise from the world's leading benefits consultancy with best-in-class technology and services to provide the resources and support necessary to help employers design and deliver comprehensive health benefits programs."

COMPLAINT
AK Retirement Mgmt Board et al. v. Mercer (US) Inc., et al.: 1JU-07-_____CI
Page 5 of 27

**EXHIBIT A**
**Page 5 of 27**

Case 1:08-cv-00002-HRH   Document 1-2   Filed 01/07/08   Page 5 of 13

15. Mercer's fees reflect its promises of best-in-class performance: Mercer received approximately $2.5 million for its work for PERS and TRS between June 1999 and April 2006, and billed the Plans at rates as high as $430 an hour.

16. Mercer is a wholly owned subsidiary of Marsh & McLennan Companies, Inc. ("Marsh"), which claims to be one of the world's largest consulting, risk management and insurance brokerage firms. Marsh is a Delaware corporation with its principal place of business at 1166 Avenue of the Americas, New York, NY 10036-2774. Its shares trade on the New York Stock Exchange.

## Jurisdiction and Venue

17. The Court has subject matter jurisdiction over this action pursuant to AS 22.10.020. The amount in controversy exceeds $100,000.00.

18. This Court has exclusive personal jurisdiction over Mercer pursuant to the parties' contract, which provides that "[a]ll actions concerning this contract shall be brought in the Superior Court of the State of Alaska." The Court also has personal jurisdiction under AS 09.05.015(a). Mercer maintains an office at 1031 West 4th Avenue, Suite 400, Anchorage, Alaska 99501, and engages, and has engaged in substantial business activities in the State of Alaska.

19. Venue is proper in the First Judicial District, among other reasons because the Plans are administered by DRB in Juneau, the ARM Board, which serves as the trustee of the Plans' assets, is based in Juneau, the series of contracts between DRB and Mercer were negotiated and executed in Juneau, and Mercer regularly met and

COMPLAINT
AK Retirement Mgmt Board et al. v. Mercer (US) Inc., et al.; 1JU-07-____ CI
Page 6 of 27

**EXHIBIT A**
**Page 6 of 27**

Case 1:08-cv-00002-HRH   Document 1-2   Filed 01/07/08   Page 6 of 13

communicated with representatives of the Plans in Juneau in connection with its work for the Plans.

## Operation of the Plans

20. PERS and TRS provide retirement, health, and other benefits to the employees of their participating employers. Once promised, the amount of these benefits is protected under the Alaska Constitution. To pay benefits, the Plans save for the future, accumulating assets during the working careers of employees to pay benefits in future years.

21. The Plans accumulate assets from three principal sources: (a) contributions from participating employers; (b) contributions from employees themselves; and (c) investment income earned on Plan assets. It is crucial that the Plans receive sufficient contributions in order to have the resources to satisfy future benefit obligations.

22. The Boards consistently adopted prudent, conservative funding goals for the Plans. They rejected the practice of funding benefits on a pay-as-you-go basis. Instead, they adopted these goals (among others):

23. *First*, the Boards wanted full, 100% funding – meaning that the Boards expected to collect all of the contributions necessary (with expected earnings) to pay expected benefits. In fact, in some years the PERS Board established a goal of 102% funding, to ensure that assets would be sufficient to pay for liabilities and for any additional benefits granted retroactively to plan participants. A funding level of less than 100% can force a plan to collect money as liabilities become due, rather than

COMPLAINT
*AK Retirement Mgmt Board et al. v. Mercer (US) Inc., et al.*; 1JU-07-    CI
Page 7 of 27

**EXHIBIT A**
**Page 7 of 27**

Case 1:08-cv-00002-HRH   Document 1-2   Filed 01/07/08   Page 7 of 13

saving in advance, and can saddle future generations with the obligation to pay prior generations' benefits.

24. **Second**, the Boards wanted to fund each individual employee's future benefits during that employee's working lifetime. Unlike other pension and benefit plans, the Boards did not want one generation of employees to fund their predecessors' or successors' benefit obligations. Every year, as employees enter and leave the Plans and salaries fluctuate, the financial characteristics and composition of the Plans changes. The Boards decided to collect in a given year the amounts needed to pay for benefit obligations arising that year and a reasonable, actuarially calculated portion of any prior accrued liability. This policy fairly allocates the cost of future benefits, ensuring that those benefits will be funded in advance by the people who will eventually receive them.

25. **Third**, the Boards wanted relatively stable employer contribution rates. The participating employers in PERS and TRS are government entities, with many demands on their limited funds. Establishing a funding goal of relatively stable contribution rates affords the participating employers the ability to make sound decisions about where to commit their remaining capital and how to fund essential governmental functions.

26. **Fourth**, the Boards decided to require advance funding not only for pension benefits, but for health benefits as well. This policy was not only prudent, but also rare among public funds. According to statements made by Mercer, outside of

COMPLAINT
AK Retirement Mgmt Board et al. v. Mercer (US) Inc., et al ; 1JU-07-___ CI

Page 8 of 27
**EXHIBIT A**
**Page 8 of 27**

Case 1:08-cv-00002-HRH   Document 1-2   Filed 01/07/08   Page 8 of 13

Alaska, until recently public funds in only three other states accrued in advance for health benefits.

27. Retirement and health plans depend on their actuaries to assist them in achieving funding goals like those adopted by the PERS and TRS Boards. The actuary's role is critical. Among other things, the actuary calculates the value of the plan's current assets and the plan's future liabilities and determines the employer contribution rates needed to achieve funding goals. In the case of PERS and TRS, the actuary determines how much money, expressed as a percentage of payroll, each employer should contribute each year to meet plan goals.

28. The Alaska Constitution prohibits the diminution of benefits, which heightens the importance of accurate calculation of liabilities.

29. If the actuary improperly calculates the employer contribution rate, the plan may not collect enough money to meet obligations as they come due. It is thus imperative that the employer contribution rate be calculated correctly, and plans seek to hire actuaries who promise that they can professionally, competently and correctly calculate that rate.

### Mercer's Services to the Plans and the Boards

30. Before and during the time it provided services to the Plans and the Boards, Mercer held itself out as one of the most experienced, qualified and capable employee pension and benefit consulting and actuarial firms in the world.

31. Beginning in the 1970s and continuing through March 22, 2005, DRB and Mercer entered into a series of written contracts, which DRB and Mercer

Case 1:08-cv-00002-HRH   Document 1-2   Filed 01/07/08   Page 9 of 13

understood were intended to benefit the Plans. Those contracts obligated Mercer to provide a variety of actuarial consulting services to the Plans. These included:

(a) preparing actuarial valuation reports setting forth the actuarial value of the Plans' assets and liabilities;

(b) calculating and recommending a consolidated employer contribution rate and, also, employer contribution rates for each PERS employer, as well as a system-wide employer contribution rate for TRS; and

(c) preserving, at least until May 2008, all notes and other work product created by Mercer in the performance of its duties, providing access to those materials on request.

32. Mercer prepared annual actuarial valuation reports for both PERS and TRS.

33. The valuation reports informed the Plans, the Boards, participating employees, Plan participants and beneficiaries, and the public of the funded status of the Plans. Thus, each valuation report set forth Mercer's calculations of the actuarial value of the respective plan's assets and liabilities, as well as the resulting funding percentage for the plan.

34. The valuation reports also included Mercer's "determination of the appropriate contribution rate" for employers in the system. Based on its calculations and professed expertise, Mercer determined an employer contribution rate that Mercer represented would ensure that the Plans would achieve their funding goals.

COMPLAINT
*AK Retirement Mgmt Board et al. v. Mercer (US) Inc., et al* : 1JU-07-_ _ _CI

Page 10 of 27
**EXHIBIT A**
**Page 10 of 27**

Case 1:08-cv-00002-HRH   Document 1-2   Filed 01/07/08   Page 10 of 13

35. Mercer knew that a crucial function of its actuarial work was to inform the Boards accurately of the Plans' funded status and provide the basis for determination of employer contribution rates. Mercer knew that the Boards relied on Mercer's work to make financial and administrative decisions regarding the Plans, including whether to seek adjustments in contribution rates and whether to increase benefits.

36. Recognizing the importance of its role, Mercer represented in each valuation report its work was carried out by actuaries who were "fully qualified to provide actuarial services to the State of Alaska," and that it had "employed generally accepted actuarial methods and assumptions" in preparing each valuation.

37. Mercer regularly attended meetings of the Boards, where Mercer actuaries presented the underlying assumptions, methods, findings and conclusions of its valuation reports. Mercer actuaries advised the Boards as to the contribution rates necessary to meet the Board's funding objectives, and as to the consequences of decisions concerning benefits and other financial and operational matters.

38. Mercer fully understood and acknowledged the Plans' essential funding goals. For example, at a January 23, 2003, joint meeting of the Boards, a written presentation given by Mercer's Brian R. McGee repeated and confirmed all of these goals:

- **Full funding:** Mercer confirmed that the Plans wanted a "100%, or more recently for PERS, 102% target funded ratio of assets to accrued liabilities";

COMPLAINT
AK Retirement Mgmt Board et al. v. Mercer (US) Inc., et al; 1JU-07-____ CI

Page 11 of 27

**EXHIBIT A**
**Page 11 of 27**

Case 1:08-cv-00002-HRH   Document 1-2   Filed 01/07/08   Page 11 of 13

- **No inter-generational transfers:** Mercer confirmed that the Plans wanted to "pay for benefits during the working lifetime of employees";

- **Stable rates:** Mercer confirmed that the plans wanted to have "relatively stable [contribution] rates over time"; and

- **Health care costs:** Mercer confirmed that the Plans wanted to accrue assets to pay for "retiree medical" costs, as well as other obligations.

39. Year in and year out, Mercer represented that its calculated employer contribution rates would allow the Boards to reach their funding goals. In reliance on Mercer's analysis and recommendations, the Boards consistently adopted employer contribution rates designed to achieve the Plans' conservative funding goals.

### Mercer's Errors

40. Despite Mercer's representations that it was a fully qualified, global leader in retirement services, equipped with state of the art tools, and despite its certifications in each valuation report that it had used generally accepted actuarial methods, in fact -- and unknown to the Boards at the time -- Mercer's work was riddled with significant errors. Mercer persistently neglected and disregarded its professional obligations and duties to the Boards and the Plans.

41. Beginning at least in the early 1990s, Mercer made critical errors in the annual valuation reports and other materials provided to the Boards and DRB. Mercer erroneously calculated -- and thus materially undervalued -- the Plans' liabilities,
COMPLAINT
AK Retirement Mgmt Board et al. v. Mercer (US) Inc., et al.; 1JU-07-____ CI
Page 12 of 27
**EXHIBIT A**
**Page 12 of 27**

Case 1:08-cv-00002-HRH   Document 1-2   Filed 01/07/08   Page 12 of 13

causing the Boards to adopt insufficient contribution rates and to make benefit increases that the Boards would not have made had Mercer discharged its professional obligations.

42. This complaint does not attempt to identify all of Mercer's errors. The most significant of Mercer's errors fall into two categories, health care errors and coding errors:

### Health Care Errors

43. One of the most important of Mercer's responsibilities was to calculate the future health care liabilities, a major and growing obligation of the Plans. Mercer failed at this task, employing methods and assumptions that fell far short of professional standards. In fact, it appears that none of the actuaries who led Mercer's work for the Plans and signed valuation reports were health care actuaries, even though Mercer employed many health care actuaries among its thousands of consultants and actuaries around the world.

44. First, Mercer far underestimated the rate at which health care costs should be assumed to grow. In order to calculate future health care costs, it is essential to determine the "health cost trend," a calculation of the percentage change in health care costs in each year. For example, in the actuarial valuation report for PERS that Mercer issued for the Plan year ending June 30, 1999, Mercer used the following health cost trend:

| | |
|---|---|
| FY99 | 9.5% |
| FY00 | 8.5% |

COMPLAINT
AK Retirement Mgmt Board et al. v. Mercer (US) Inc., et al.; 1JU-07-___CI

Page 13 of 27
**EXHIBIT A**
**Page 13 of 27**

Case 1:08-cv-00002-HRH   Document 1-2   Filed 01/07/08   Page 13 of 13